IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: ) | |
| ) | Case No. 23-30246 |
| Bourbon Street LLC, ) | Chapter 11 – Subchapter V |
| d/b/a La Cantina, et al. ) | |
| ) | |
| Debtors, Jointly Administered. ) | |

## REPORT PURSUANT TO 11 U.S.C. § 1188

Come now Bourbon Street LLC ("Bourbon Street"), Petri Enterprises, LLC ("Petri Enterprises"), and Gannett Peak, LLC ("Gannett Peak") (Bourbon Street, Petri Enterprises, and Gannett Peak being collectively known as the "Debtors" and each sometimes known as a "Debtor"), by and through undersigned counsel, pursuant to Section 1188 of Title 11 of the United States Code, and furnish the following status report:

### I.  Introduction

These are – and will continue to be – interesting cases. Each of the three Debtors operates a restaurant and a bar, with the trifecta of eateries sharing common branding, common menus, and, yes, common gift cards. But while the two more rural dining destinations come aided by a history of profitability, Bourbon Street is a relatively new operation that has struggled under the weight of a crushing lease together with the growing pains of entry in a larger market. These struggles invited good faith efforts on the part of a common equity interest to infuse the proceeds of one business into another business, but those efforts rather quickly descended into forming financially-unhealthy relationships with various so-called "merchant cash advance" ("MCA") companies.

By the time these three companies found their way to this Honorable Court, four essential tranches of creditors existed: (i) traditional lending partners, mostly (albeit not entirely) in the form of FDIC-insured banks, with whom the Debtors have been able to thus far work in a productive,

1

good faith manner; (ii) trade creditors, upon whom the Debtors are reliant, whose claims are generally *de minimis* relative to those of other obligees; (iii) landlords, two of whom are friendly insiders and one of whom has thus far ignored an entreaty to so much as discuss the correlative case; and (iv) MCAs, one of which is already the target of an adversary proceeding, another of which will be similarly named as a defendant shortly, a third of which has engaged exemplary counsel and engaged in productive dialogue, and the rest of which remain essentially AWOL.

Being "interesting" is, of course, not always a good thing. No doubt all three Debtors would much prefer to stay focused on serving food and beverages, rather than undertake the hard work of endeavoring to reorganize under Title 11 of the United States Code (the "Bankruptcy Code"). But in each of these three cases may be found the hopes of a consensual confirmation, even if candor necessitates a recognition that such may be more likely in the two matters where the Debtors' landlord is a friendly insider.

## II.    Efforts to Attain a Consensual Plan

Courtesy of a flurry of first day motions and related early case issues, the Debtors have been in touch with counsel for myriad creditors despite a Section 341 meeting being yet to occur. Every such lawyer has expressed a seemingly-earnest desire to work with the Debtors, employing the various tools of the bankruptcy process, and there thusly exists a hope that a consensual plan (or, as it is, three consensual plans)[1] may be achieved in these cases.

Without wading into the privileged realm of settlement discussions, the Debtors can share that their counsel has been in touch with counsel for multiple traditional lenders, and there are efforts underway to work in a collaborative and strategic fashion with at least one of those parties.

---

[1] For want of ambiguity, the Debtors are aware of their obligation to each file separate plans of reorganization.

2

The value of security interests will be a topic of some focus as these cases progress, and the Debtors are working to explore the degree to which differing views on the fair market value of collateral may, in turn, open opportunities to renegotiate certain core financing terms.

Vis a vis the three landlords, two of the Debtors will shortly be filing a motion to approve new, formalized lease provisions that are designed to aid in the reorganization process. Given that the two correlative landlords are insiders, this may not be the most herculean of achievements, but such will nonetheless mark a critical step toward establishing forward-looking streams of predictable profit that, in turn, can be used to finance plans of reorganization. As for the third landlord, "what we've got here is failure to communicate." Cool Hand Luke (Warner Bros. 1967). It is hoped something will be heard from the owner of Bourbon Street's premises, preferably sometime soon; the subject lease is at a rate that does not comport with current market conditions, necessitating some renegotiation if a plan is to have the best chance of succeeding. But there are certainly concessions Bourbon Street is prepared to make in exchange for a curtailment of rent, with a genuine belief that marked progress can be made as soon as contact is established.

In terms of trade creditors, the major stakeholders have already been deemed critical vendors and paid their pre-petition claims, suggesting they will not ultimately be asked to vote on plans of reorganization. There do exist other trade creditors, however, and the Debtors' counsel has had meaningful conversations with counsel for one of the entities that filed a rather prompt proof of claim herein. There is reason to surmise that entity's vote in support of a plan will prove ultimately obtainable.

This leaves the MCAs. While one such entity has appeared in these cases through counsel, negotiated cash collateral verbiage in an eminently reasonable manner, and shown every sign of being a collaborative working partner, the other similarly-situated creditors have done much the

3

opposite. At least two MCAs appear to have violated the automatic stay, with the crushing nature of their pre-petition transactions also inviting open concern about a series of fraudulent conveyances being afoot. One adversary proceeding has already been filed, with another one likely to be docketed imminently. More are almost certain to follow. And while this assuredly does not portend optimistically for a consensual plan, the Debtors are nonetheless cognizant that litigation often succeeds in bringing creative people to its own settlement table, suggesting there is still – perhaps – a chance for these relations to be mended before any ballots are cast on plans of reorganization.

Respectfully submitted,

Dated: September 1, 2023   By:   /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtors*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of September, 2023, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

4