**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**(Fargo Division)**

| | |
|---|---|
| In Re: | Bankruptcy No. 23-30246 |
| | Chapter 11- Subchapter V |
| Bourbon Street LLC, | Jointly Administered |
| dba La Cantina, *et al.* | |
| Debtor. | |
| _____/ | |
| Petri Enterprises, LLC, | Bankruptcy No. 23-30247 |
| dba La Cantina, | Chapter 11 Subchapter V |
| dba Heros and Legends Sports Bar, | Jointly Administered |
| dba Heros and Legends, | |
| Debtor. | |
| _____/ | |
| Gannett Peak, LLC, | Bankruptcy No. 23-30248 |
| dba La Cantina, | Chapter 11 – Subchapter |
| | Jointly Administered |
| Debtor. | |

**OBJECTION TO CONFIRMATION OF PETRI ENTERPRISES, LLC'S**
**SUBCHAPTER V PLAN OF REORGANIZATION BY KAPITUS SERVICING INC., AS**
**SERVICING AGENT FOR KAPITUS, LLC**

COMES NOW Kapitus Servicing Inc., as Servicing Agent for Kapitus, LLC ("Kapitus") a

secured creditor and party-in-interest in the above-captioned case, by its counsel of record, and

hereby files its *Objection to Confirmation of Petri Enterprises, LLC's Subchapter V Plan of*

*Reorganization* ("Objection"), a hearing on which is currently scheduled on December 5, 2023. In

support of its Objection, Kapitus respectfully states as follows:

**I.      RELIEF REQUESTED**

1.      Kapitus seeks entry of an order from the Court (defined below) denying

confirmation of *Petri Enterprises, LLC's Subchapter V Plan of Reorganization* [Case No. 23-

30246, ECF 108] (the "Plan") pursuant to Title 11 of the United States Code (the "Bankruptcy

Code"). Specifically, the Plan violates Bankruptcy Code Sections 1129(a)(3), 1129(a)(7), and

1129(a)(11), all made applicable in this case by Section 1191(a); Sections 1129(a)(1) via Sections 1191(a) and 1190(1)(B); Section 1129(b)(2)(A), made applicable through Section 1191(c); and Section 1191(c)(3)(A) as described herein.

## II.  JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of North Dakota (Fargo Division) (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      Confirmation of a plan constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (L). Therefore, the Court holds constitutional authority to enter a final order and judgment. *See Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1938–40 (2015); *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 (2011).

5.      To the extent it is later determined the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution, Kapitus consents to entry of a final order by the Court in connection with this Objection.

## III. BACKGROUND

6.      Petri Enterprises, LLC ("Debtor") was formed in July 2007 and has operated the La Cantina restaurant a "Tex-Mex" dining establishment located in Mayville, North Dakota at all times since. See Plan, p. 1 [Case No. 23-30246, ECF 108].

7.      On July 29, 2023 (the "Petition Date"), Debtor filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq*, commencing the above-captioned case and elected to proceed as a Subchapter V case.

8.      The Debtor currently operates as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. A Subchapter V trustee has been appointed.

9.      On the Petition Date, Debtor filed its bankruptcy Schedules and Statement of Financial Affairs (collectively, "Schedules"). [Case No. 23-30247, ECF 1].

10.     Debtor's Schedules do not list Kapitus's claim as contingent, unliquidated, or disputed, but Debtor does list Kapitus as unsecured noting "Loan (No Recorded UCC)." Schedules, pp. 19 of 42 [Case No. 23-30247, ECF 1].

11.     Kapitus is a secured creditor of the Debtor. See generally Kapitus POC, **Exhibit 1**.

12.     Kapitus' Proof of Claim ("POC") is filed as secured and in the amount of $57,604.00. Id.

13.     Debtor has not objected to Kapitus's Proof of Claim. [Case Nos. 23-30246 and 23-30247].

14.     Debtor's proposed Plan, however, in addition to treating Kapitus's claim as impaired (Class 2), states, in part: "… Debtor received $17,988.00 in exchange for the conveyance of $71,808.00 in future accounts receivable. The claim is supported by a UCC Financing Statement that does not appear to have ever been filed in the appropriate registry pre-petition. The Debtor maintains (i) the underlying sale was a fraudulent conveyance, leaving Kapitus with a claim for only those monies it actually paid to Petri Enterprises; and (ii) the security interest is avoidable under Section 544 of the Bankruptcy Code."[1] See Plan, p. 5 [Case No. 23-30246, ECF 108].

15.     Kapitus objects to Debtor's characterization of its funding of Debtor's business as a "fraudulent conveyance." Id. Kapitus purchased certain of Debtor's Receipts (defined below) pursuant to two agreements with the Debtor entered into in October 2022 and May 2023, and

---

[1]      Debtor also refers to Kapitus's POC as being related to a "merchant cash advance claim." See Plan, p. 5 [Case No. 23-30246, ECF 108]. Kapitus, in general, objects to this characterization of its business.

funded the Debtor according to the terms of those Agreements (defined herein). Kapitus's purchase of Debtor's Receipts was supported by consideration and was not a "fraudulent conveyance." [2]

16.    On October 6, 2022, Kapitus and Debtor entered into a: (i) Forward Purchase Agreement (Fixed ACH Delivery); (ii) Authorized Sub-Servicing Agent; (iii) Sales Terms and Conditions; (iv) Security Agreement; (v) Guaranty; and (vi) Agreement to Arbitrate[3] (collectively, the "October 2022 Agreement"). See generally October 2022 Agreement, **Exhibit 2**.[4]

17.    Pursuant to the October 2022 Agreement, Kapitus purchased Debtor's Receipts for a Net Purchase Price of $43,387.50 (after closing and other fees as agreed to by the parties). October 2022 Agreement, p. 1 of 21, **Exhibit 2**.

18.    Kapitus funded the October 2022 Agreement on October 6, 2022, and Debtor received the Net Purchase Price of $43,387.50. Id. See also Contract Funding Summary, **Exhibit 3**.

19.    On October 7, 2022, Kapitus caused to be filed a UCC-1 Financing Statement with the North Dakota Secretary of State related to the October 2022 Agreement and securing Kapitus' interest in the Debtor's assets.  See Kapitus POC, "UCC-1," pp. 32-36 of 36, **Exhibit 1**.

20.    A copy of this UCC-1 Financing Statement filed by Kapitus using the representative name and service of CT Corporation System is attached as Exhibit 3 to Kapitus' POC. Id.

---

[2]    Kapitus further notes the Agreements (defined herein) call for the Debtor and the Guarantor, jointly and severally, to indemnify and hold the Purchaser Parties [defined therein and including Kapitus] harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and attorneys' fees) that the Purchaser Parties may sustain or incur by reason of defending claims asserted by Seller and/or Guarantor as well as the payment of the Purchaser Parties' reasonable costs. See Kapitus POC, "May 2023 Agreement," ¶¶ 1.6, 3.3, pp. 13, 16 of 36, **Exhibit 1**; October 2022 Agreement, ¶¶ 1.6, 3.3, pp. 5, 9 of 21, **Exhibit 2.**
[3]    The Agreement to Arbitrate is voluntary.
[4]    Kapitus' POC will be amended to include reference to and a copy of the October 2022 Agreement, but the October 2022 Agreement is also attached as Exhibit 2 to this Objection.

21.   On May 3, 2023, Kapitus and Debtor entered into a: (i) Forward Purchase Agreement (Fixed ACH Delivery); (ii) Authorized Sub-Servicing Agent; (iii) Sales Terms and Conditions; (iv) Security Agreement; (v) Guaranty; (vi) Agreement to Arbitrate;[5] (collectively, the "May 2023 Agreement" and with the October 2022 Agreement, the "Agreements"). See Kapitus POC, "May 2023 Agreement," pp. 8-28 of 36, **Exhibit 1**.

22.   As part of the May 2023 Agreement, Debtor agreed to and signed a Renewal Balance Buyout, pursuant to which Debtor agreed to use a portion of the proceeds from the May 2023 Agreement towards the amount due pursuant to the October 2022 Agreement. See Renewal Balance Buyout Dated May 3, 2023, **Exhibit 4**.

23.   As of May 3, 2023, the remaining amount due to Kapitus pursuant to the October 2022 Agreement was $33,492.00. Id.

24.   The May 2023 Agreement called for a Purchase Price of $52,800.00 (subject to closing and other fees as agreed to by the parties). See Kapitus POC, "May 2023 Agreement," pp. 8 of 36, **Exhibit 1**.

25.   On May 3, 2023, Kapitus funded the May 2023 Agreement and Debtor received the Net Purchase Price of $17,988.00, which accounted for the Renewal Balance Buyout plus an additional $1,572.49 discounted off of the Renewal Balance Buyout and which was added to the funded amount, for a total funded amount of $19,570.49 (Net Purchase Price of $17,998 + discount of $1,572.49 = $19,570.49).   See Kapitus POC, "May 2023 Agreement," pp. 8 of 36, **Exhibit 1**, Renewal Balance Buyout Dated May 3, 2023, **Exhibit 4**; Contract Funding Summary (Redacted), **Exhibit 3**.

---

[5]   The Agreement to Arbitrate is voluntary.

26.    Therefore, under the May 2023 Agreement, while Debtor received the $19,570.49 on the Purchased Amount of $71,808.00, the Purchased Amount listed in the May 2023 Agreement also includes the amounts still due under the October 2022 Agreement. See Kapitus POC, "May 2023 Agreement," pp. 8 of 36, **Exhibit 1**, Renewal Balance Buyout Dated May 3, 2023, **Exhibit 4**; Contract Funding Summary (Redacted), **Exhibit 3**.

27.    Debtor's statement in its Plan that Debtor "received $17,988.00 in exchange for the conveyance of $71,808.00 in future accounts receivables," is incorrect. See Plan, p. 5 [Case No. 23-30246, ECF 108].

28.    From October 2022 until May 2023 Kapitus purchased Debtor's Receipts and funded Debtor $62,947.99 (after closing and other fees as agreed to by the parties). Contract Funding Summary, **Exhibit 3**.

29.    Debtor's statement in its Plan that Kapitus' UCC-1 Financing Statement "does not appear to have ever been filed in the appropriate registry pre-petition," is also incorrect as Kapitus' UCC-1 Financing Statement was filed on October 7, 2022, and is attached to Kapitus' POC. See Kapitus POC, "UCC-1," pp. 32-36, **Exhibit 1.**

30.    The UCC-1 attached to Kapitus' Proof of Claim supports the secured status of Kapitus even though CT Corporation System, as representative, is listed under Section 3 of the UCC-1. Id.

31.    CT Corporation System is an authorized representative of Kapitus in connection with UCC filings.  According to the Code of Virginia[6], a financing statement is sufficient if it provides the name of the secured party or a representative of the secured party. Va. Code Ann. §

---

[6]    The Agreements are subject to the laws of the Commonwealth of Virginia. See Kapitus POC, "May 2023 Agreement," Paragraph 4.5, p. 17 of 36, **Exhibit 1**; See October 2022 Agreement, Paragraph 4.5, p. 10 of 21, **Exhibit 2**.

8.9A-502(2).  Moreover, the "[f]ailure to indicate the representative capacity of a secured party or representative of a secured party does not affect the sufficiency of the financing statement."  Va. Code Ann.§ 8.9A-503(d).

32.     Pursuant to Paragraph 1.10 "UCC Agent and D/B/A's", of the October 2022 Agreement, Debtor acknowledged and agreed Kapitus may be using "doing business as" or "d/b/a" names in connection with various matters relating to the agreement between the parties, including the filing of UCC-1 financing statements and other notices or filings. See Kapitus POC, "May 2023 Agreement," Paragraph 1.10, p. 13 of 36, **Exhibit 1**; See October 2022 Agreement, Paragraph 1.10, p. 6 of 21, **Exhibit 2**.

33.     Accordingly, CT Corporation System is an authorized representative of Kapitus pursuant to Sec. 1.10 of the Agreements and as permitted under the Virginia Code (as applicable).

34.     The UCC-1, filed for notice purposes, does not diminish the fact that Kapitus was given a security interest in the Kapitus's Collateral (defined below) by the Debtor, but rather supports the perfection of that security interest.

35.     As of the Petition Date, Debtor's obligations to Kapitus under the Agreements were secured by all of the personal property of Debtor including, without limitation "all accounts, accounts receivable, contracts … all inventory … goods, including without limitation, all machinery, equipment … general intangibles … all cash on hand and on deposit in banks … all other assets … whether now or hereafter owned or acquired by Borrower [Debtor] and wherever located; and all proceeds of the foregoing" (collectively referred to herein as "Kapitus's Collateral").  See Kapitus POC, "May 2023 Agreement," p. 20 of 36, **Exhibit 1**; See October 2022 Agreement, p. 13 of 21, **Exhibit 2**.

36.     Kapitus's security interest in Kapitus's Collateral was and remains perfected.[7]

37.     On October 27, 2023, Debtor filed its Plan. [Case No. 23-30246, ECF 108].

38.     Objections to Debtor's Plan are due on by November 28, 2023. [Case No. 23-30247, ECF 58].

39.     Kapitus's Objection to Debtor's Plan is timely.

### IV. OBJECTION

### A.    Subchapter V Confirmation Standards

40.     Section 1191 of the Bankruptcy Code sets forth the legal standards for confirmation in a Subchapter V case. 11 U.S.C. § 1191. Under Section 1191, Section 1129(a) of the Bankruptcy Code remains applicable in a Subchapter V case and governs consensual confirmation.[8] *In re Pearl Resources LLC*, Case No. 20-31585, 2020 WL 5823303, at *10 (Bankr. S.D. Tex. Sept. 30, 2020).

---

[7]     Pursuant to the Security Agreement incorporated into the May 2023 Agreement, Kapitus's October 2022 UCC-1 related to any other agreement between the parties and Kapitus's security interest would and does relate back to the original UCC-1 filing of October 2022. Specifically, the Security Agreement entered into by the Parties in May 2023, provides, in part:

> "Seller and Guarantor acknowledge and agree that any security interest granted to Purchaser under any other agreement between Seller [Debtor] and Purchaser [Kapitus] will secure the obligations hereunder, and that the Seller's obligations secured by this Security Agreement, and the Collateral granted hereunder, <u>shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral.</u>

> Seller and Guarantor further acknowledge and agree that if, in the future, Seller enters into any agreement with Purchaser, any security interest granted to Purchaser under such future agreements will relate back to this Security Agreement, and that the Seller and/or Guarantor's obligations, and the Collateral granted, under such future agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral."

See <u>Kapitus POC</u>, "May 2023 Agreement," pp. 20-21 of 36, **Exhibit 1**.
[8]     Only Section 1129(a)(15) of the Bankruptcy Code (applicable to individual debtors) does not apply in the Subchapter V context.

41.     The Debtor bears the burden on issues of confirmation by a preponderance of the evidence. *See In re Reuter*, 427 B.R. 727, 769 (Bankr. W.D. Mo. 2010*), aff'd,* 443 B.R. 427 (B.A.P. 8th Cir. 2011), *aff'd*, 686 F.3d 511 (8th Cir. 2012). ("The proponent of the plan bears the burden of proof with respect to each element of § 1129(a) by a preponderance of the evidence"); *In re T-H New Orleans Ltd. P'ship.*, 116 F.3d 790, 801 (5th Cir. 1997) (Noting the standard of proof under Section 1129 is the preponderance of the evidence); *In re Huggins*, No. BK12-42692-TJM, 2013 WL 4502825, at *1 (Bankr. D. Neb. Aug. 22, 2013) (Noting under Section 1129(a)(11), the debtor bears the burden of establishing the feasibility of the plan by a preponderance of the evidence); *In re Danny Thomas Properties II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001) (Discussing the burden on feasibility).

42.     A consensual confirmation under Section 1191(a) of the Bankruptcy Code can occur only if all impaired classes have accepted the plan. 11 U.S.C. § 1191(a). If a Subchapter V debtor does not have full consent, Section 1191(b) of the Bankruptcy Code establishes the rules for confirmation of a non-consensual plan. 11 U.S.C. § 1191(b) & (c).[9]

**B.     The Debtor's Plan Is Not Fair And Equitable**

43.     Kapitus's claim is treated as impaired under the Plan "unless the claim of Kapitus Servicing is deemed secured by a final order of this Honorable Court."  See Plan, pp. 5, 7 [Case No. 23-30246, ECF 108].

44.     Kapitus has timely voted to reject the Plan.

45.     Because Kapitus, the only creditor in Class 2, voted to reject the Plan, the Debtor must satisfy the requirements for cramdown under Sections 1191(b) and (c) of the Bankruptcy

---

[9]     These sections replace the cramdown requirements of Section 1129(b), which do not directly apply in a Subchapter V case.

Code.  Under the cramdown rules in Section 1191(b), a plan can only be confirmed if it does not

discriminate unfairly against any impaired, non-consenting class and is fair and equitable regarding

each class of impaired claims or interests that has rejected the plan. See 11 U.S.C. § 1191(b); *See*

*also Matter of Topp's Mech., Inc.*, No. BK21-40038-TLS, 2021 WL 5496560, at *1 (Bankr. D.

Neb. Nov. 23, 2021) (Noting 11 U.S.C. § 1191(b) governs confirmation standards when a class of

claims has not accepted the plan and is impaired under the plan. "Specifically, one of the standards

in such a situation is that the court can confirm a plan only if it does not discriminate unfairly and

is fair and equitable with respect to each impaired class that has not accepted the plan").

46.     For a plan to be "fair and equitable," the debtor must show that the plan satisfies

each of the requirements of Section 1191(c):

> (1)     Secured claims must receive proper treatment under section
> 1129(b)(2)(A) of the Bankruptcy Code.
>
> ****
>
> (3)(A)  The debtor will be able to make all payments under the plan or there
> is a "reasonable likelihood" it will be able to make all payments under the
> plan.

11  U.S.C. § 1191(c).

47.     Sections 1191(c)(1) and (3)(A) are addressed in turn.

**(i)     The proposed treatment of Kapitus's secured claim does not satisfy section
1129(b)(2)(A)**

48.     Section 1129(b)(2)(A), made applicable through Section 1191(c), provides with

respect to a class of impaired secured creditors, a plan is fair and equitable if the plan provides, in

part:

> (1)     The plan provides that the holders of the secured claims retain their
> liens to the extent of the allowed amount of such claims and each holder of
> a claim receive deferred cash payment totaling at least the allowed amount

10

of the claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in the property;

(2)    The plan provides for the sale, subject to section 363(k), of the property subject to the liens securing the claim, free of the liens, with the liens attaching to the proceeds; or

(3)    The plan provides for the realization by such holders of the indubitable equivalent of such claims.

Collier on Bankruptcy, ¶ 1191.04 (Richard Levin & Henry J. Sommer eds., 16th ed.). See 11 U.S.C. §§ 1191(c), 1129(b)(2)(A)(i)-(iii).

49.    First, this requires the secured creditor to retain its liens to the extent of the allowed amount of such claims. 11 U.S.C. § 1129(b)(2)(A)(i)(I).

50.    As noted above, Kapitus's claim is fully secured. Accordingly, for the Debtor's Plan to be confirmed, it must show that Kapitus's claim going forward will continue to be fully secured. The Debtor does not satisfy this treatment.

51.    Debtor's Plan, in part, provides for Kapitus's weekly payments of $932.00 called for under the May 2023 Agreement to be converted into a five-year (60-month) term loan with monthly payments of an undetermined amount, which **payments do not commence until the first business day of the sixty-first (61st) month <u>after</u> the Effective Date of the Plan**.[10] <u>See</u> <u>Plan</u>, p. 6 [Case No. 23-30246, ECF 108]; <u>see also</u> <u>Plan</u>, "Promissory Note," Exhibit C, p. 1 [Case No. 23-30246, ECF 108-3].

52.    Accordingly, Debtor proposes to make Kapitus wait to receive payments on its secured claim until the sixty first (61st) month <u>after</u> the Effective Date of the Plan, and then be to be paid on its claim over another five-year payout period. <u>Id</u>.

---

[10]    "**Section 8.02 Effective Date**. The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated" <u>See</u> <u>Plan</u>, p. 9 [Case No. 23-30246, ECF 108]

53.    Kapitus, which presently has a fully secured claim, will only continue to watch its secured position decline from the Debtor's operations during the 60 months Debtor is paying its other creditors under the Plan and will be forced to wait for its secured claim to be paid over the course of what amounts to 10 years.

54.    Debtor's monthly operating reports ("MOR") show Debtor has failed to demonstrate that it can earn a profit.

| ECF [Case No. 23-30246] | Operating Month | Cash on Hand End of Month | Net Cash Flow From Operations |
|---|---|---|---|
| 101 | August | $    10,817.66 | $        (5,497.75) |
| 104 | September | $    7,074.46 | $        (3,743.20) |
| 117 | October | $    1,634.84 | $        (5,439.62) |
| | | | $    (14,680.57) |

See Debtor's Monthly Operating Reports for August, September, and October [Case No. 23-30246, ECFs 101, 104, 117].

55.    While Subchapter V cases are meant to be relatively short in duration, Debtor has lost money and underperformed compared with projections since the Petition Date, with total negative cash flow from operations of ($14,680.57) and, as of the end of October, only $1,634.84 in the bank.

56.    The value of Kapitus's Collateral securing Kapitus's claim has declined over the course of this case and will likely only continue to decline over the next ten years.

57.    Considering these circumstances, the Debtor's proposed treatment of Kapitus's claim cannot be approved over Kapitus's objection.

58.    Second, the Debtor must show that Kapitus will:

> [R]eceive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i)(II).

59.     This means that "a secured claimant has a right to receive under a plan the present value of his collateral." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 377, 108 S. Ct. 626, 633 (1988).

60.     Because Kapitus is secured, Kapitus must receive future payments, when discounted back to today's dollars, equal to the full value of Kapitus's secured claim. In other words, Kapitus's claim must be valued at par.

61.     Recently, in *In re Topp*, the Eighth Circuit Court of Appeals addressed the circuit's approach to cramdown interest rates in Chapter 12 cases. *In re Topp*, 22-2577 (8th Cir. Aug. 2, 2023). Upholding Judge Shodeen, the Court of Appeals held, in general, that the Eighth Circuit allows a debtor to begin with the Treasury rate and add a relevant risk-adjustment.  *In re Topp*, 22-2577 (8th Cir. Aug. 2, 2023), citing *U.S. v. Doud*, 869 F.2d 1144, 1146 (8th Cir. 1989). *See also In re Kellogg Square P'ship*, 160 B.R. 343, 363 (Bankr. D. Minn. 1993) (citations and modifications omitted) ("In general, . . . binding Eighth Circuit precedent requires the proponent of the plan to identify a rate of interest that could be earned on a risk-free investment, such as that currently paid on a United States treasury bond of like term, and then to augment that rate by an increment that is sufficient to compensate the secured creditor for the risk it will bear over the term of the reamortization, as a result of the reorganized debtor's retention of the possession of the collateral") (emphasis added).

62.     Having found no error in starting with the Treasury rate, in the second step of this process, "the appropriate risk adjustment depends on the risk already accounted for in the starting rate." *In re Topp*, 22-2577 (8th Cir. Aug. 2, 2023). Judge Gruender noted the Treasury rate can be considered risk-free and the prime rate includes a risk premium. Id. *See also In re Kellogg Square*

*P'ship*, 160 B.R. 343, 363 ("The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default").

63.     **Debtor's proposed interest rate as to Kapitus's claim** is simply "the rate set forth pursuant to the allowances of Section 1274(d) of Title 26 of the United States Code" and **contains no adjustment for risk**. See Plan, p. 6 [Case No. 23-30246, ECF 108]; see also Plan, "Promissory Note," Exhibit C, p. 1 [Case No. 23-30246, ECF 108-3].

64.     The risk to Kapitus's secured claim, given Debtor's financial position as reflected in the MORs, is significant even if Kapitus were to receive payments during the actual, five-year Plan term let alone being forced to wait over five years to being to receive payments.

65.     Debtor's proposed treatment of Kapitus's secured claim falls far short of what is required for it to be fair and equitable.

66.     Accordingly, because the repayment of Kapitus's secured claim does not offer Kapitus a stream of payments that, when discounted back to the Effective Date equal anything close to the full value of its secured claim, the Plan cannot be confirmed.

**(ii)     There is no reasonable likelihood that the Debtor will be able to make payments required under the Plan**

67.     Section 1191(c)(3)(A) of the Bankruptcy Code requires "[t]he debtor will be able to make all payments under the plan; or . . . there is a reasonable likelihood that the debtor will be able to make all payments under the plan." 11 U.S.C. § 1191(c)(3)(A).

68.     Section 1191 of the Bankruptcy Code does not simply employ the "feasibility" standard of Section 1129, the standard under Section 1191 must be something different. At least one court has interpreted the "reasonable likelihood" standard of Section 1191 to be stricter than

the feasibility standard under Section 1129. *See Pearl Resources*, 2020 WL 5823303, at *22 (Finding that the Section 1191 standard is a "fortifie[d]" version of the "more relaxed feasibility test" provided by Section 1129(a)(11)).

69.     Feasibility—the easier to satisfy standard—precludes confirmation of a plan based on "visionary schemes." *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). "But 'feasibility' can be read broader to ask simply, 'Is this plan even possible'?" *In re NNN Parkway 400 26, LLC*, 505 B.R. 277, 285 (Bankr. C.D. Cal. 2014).

70.     To provide sufficient evidence of feasibility, "[t]he debtor must offer more than speculation about the source of funding for the plan." *In re Walker*, 165 B.R. 994, 1003 (E.D. Va. 1994). Among other things, "Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *S & P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995).

71.     To confirm the Plan, the Debtor must provide more compelling evidence than is required to satisfy the already burdensome feasibility standard. It must show that it "will be able to make" or that "there is a reasonable likelihood that the debtor will be able to make" the payments required under the Plan. 11 U.S.C. § 1191(c)(3)(A). Here, the Debtor cannot make this showing.

72.     Debtor's Plan and related financial projections show the Debtor being able to make the called for $750.00 in Plan payments a month despite showing **projected negative income (prior to Plan payments) for 30 of the 73 months projected**. See Plan, "Financial Projections," Exhibit A [Case No. 23-30246, ECF 108-1]. Debtor's MORs tell a different story, with Debtor having total negative cash flow from operations of ($14,680.57) over three months and only

$1,634.84 in the bank as of the end of October. See Debtor's Monthly Operating Reports for August, September, and October [Case No. 23-30246, ECFs 101, 104, 117].

73.    The Debtor simply cannot base its Plan on these projections because they do not show that there is a reasonable likelihood the Debtor can make the payments required under the Plan.

### C.    Confirmation Of Debtor's Plan Is Likely To Be Followed By Liquidation Or The Need For Further Financial Reorganization Of The Debtor

74.    As stated above, Section 1191(c)(3) requires the Debtor demonstrate, in part, there is as least "a reasonable likelihood that the debtor will be able to make all payments under the plan." 11 U.S.C § 1191(c)(3).

75.    In a similar vein,  pursuant to Section 1129(a)(11) of the Bankruptcy Code,  made applicable through Section 1191(a), the Court must find "[c]confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §§ 1129(a)(11), 1191(a).

76.    The feasibility test requires a court to determine whether a plan is workable and has a reasonable likelihood of success.

77.    Debtor's Plan and related financial projections show the Debtor having projected negative income (prior to Plan payments) for 30 of the 73 months projected. See Plan, "Financial Projections," Exhibit A [Case No. 23-30246, ECF 108-1]. Debtor's MORs show negative cash flow from operations of ($14,680.57) over three months and only $1,634.84 as of nearly one month ago.  See Debtor's Monthly Operating Reports for August, September, and October [Case No. 23-30246, ECFs 101, 104, 117].

16

78.     Additionally, as discussed below, a related debtor moved to convert its companion case, Bourbon Street LLC, after filing a proposed Plan of Liquidation. [Case 23-30246, ECFs 110, 115].

79.     The Debtor's financial projections, MORs, and cash on hand as of the filing of this Objection show Debtor is almost certain to experience a Plan default shortly after Confirmation or, similar to Bourbon Street LLC, seek to convert its case after Confirmation. Accordingly, Debtor's Plan is not feasible because it does not have a reasonable likelihood of success.

**D.     The Plan Does Not Satisfy The Best Interests Of Creditors Test**

80.     As explained by Collier, pursuant to Section 1129(a)(7), made applicable in this case by Section 1191(a), unless agreed otherwise, "a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution if the debtor were liquidated instead of reorganized on the plan's effective date." Collier on Bankruptcy ¶ 1129.02 (Richard Levin & Henry J. Sommer eds., 16th ed. 2020).

81.     Based upon the Debtor's own projections and "Liquidation Analysis," the Plan does not satisfy the best interests of creditors test.

82.     Under the Plan, Debtor states, in part: "The Debtor proposes to pay general unsecured creditors $35,173.92 under this plan, a sum that will be increased by any adversary litigation recoveries and, in any instance, that is well in excess of the foregoing proceeds that would be potentially made available [to pay general unsecured creditors] through a Chapter 7 liquidation [estimated at no more than $18,808.90]." See Plan, "Liquidation Analysis," p. 2 [Case No. 23-30246, ECF 108].

83.     Accordingly, in any liquidation unsecured creditors would receive some cash distribution based upon the liquidation of the Debtor's assets.

84.     The proposed $35,173.92 in Plan payments to Debtor's general unsecured creditors depends upon the Debtor achieving its revenue projections, which, as noted above, are highly speculative when compared to Debtor's MORs and still show projected negative income (prior to Plan payments) for 30 of the 73 months projected. See Plan, "Financial Projections," Exhibit A [Case No. 23-30246, ECF 108-1].

85.     The Debtor cannot prove, based upon these projections as well as speculative "adversary litigation recoveries," that unsecured creditors will do better under the Plan than they would in a liquidation. See Plan, "Liquidation Analysis," p. 2 [Case No. 23-30246, ECF 108].

### E.      The Debtor's Plan Fails To Provide A Proper Liquidation Analysis

86.     Section 1190(1), *et. seq.*, of the Bankruptcy Code sets forth the required contents of a Subchapter V plan.

87.     The contents a plan proposed pursuant to Subchapter V are, admittedly, minimal, but they are mandatory not permissive, and specifically direct a Subchapter V plan "shall include" three things: (1) a brief history of the debtor; (2) a liquidation analysis; and (3) projections as to the ability of the debtor to make payments under the proposed plan of reorganization. 11 U.S.C. § 1190(1)(A)-(C).

88.     Section 1129(a)(1) provides: "The court shall confirm a plan only if all of the following requirements are met: (1) The Plan complies with the applicable provisions of this title." 11. U.S.C. § 1129(a)(1).

89.     One of the "applicable provisions of this title" required for confirmation of a Subchapter V plan is a liquidation analysis. 11 U.S.C. § 1190(1)(B).

90.     Accordingly, Debtor's Plan cannot be confirmed because the Plan fails to provide a proper liquidation analysis in that it fails to provide a waterfall and project how much each

creditor would obtain in a hypothetical Chapter 7 liquidation case. See 11 U.S.C. §§ 1191(a), 1129(a)(1), and 1190(1)(B). See also Plan, "Liquidation Analysis," p. 2 [Case No. 23-30246, ECF 108].

### F.   Debtor's Plan Was Not Filed In Good Faith

91.     Bankruptcy Code Section 1129(a)(3), made applicable in this case by Section 1191(a), requires a Chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C §§ 1129(a)(3), 1191(a).

92.     There is no definition of "good faith" in the Bankruptcy Code and the standards for good faith under case law are not, necessarily, consistent from one section of the code to another.

93.     "[I]n this Circuit, a chapter 11 Plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re Riverbend Leasing LLC*, 458 B.R. 520, 529 (Bankr. S.D. Iowa 2011) *quoting In re Reuter*, 427 B.R. 727, 770 (Bankr.W.D.Mo.2010) *citing Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir.1987) (Overturned on other grounds). *See also Western Real Estate Equities, L.L.C. v. Village at Camp Bowie I, L.P.  (In re Village at Camp Bowie I, L.P.)*, 710 F.3d 239, 246 (5th Cir. 2013) *quoting In re Cajun Elec.  Power Co-op., Inc.*, 150 F.3d 503, 519 (5th Cir. 1988) (Good faith under § 1129(a)(3) "should be evaluated 'in light of the totality of the circumstances surrounding establishment of [the] plan,' mindful of the purposes underlying the Bankruptcy Code") (emphasis added).

94.     The court must determine "whether the plan constitutes an abuse of the provisions, purpose or spirit of the Code" judging each case on its own facts. *In re Riverbend Leasing LLC*, 458 B.R. 520, 529 *quoting In re Reuter*, 427 B.R. 727, 770. Put simply, what constitutes good faith, like much in bankruptcy, boils down to an equitable decision by the Court.

19

95.    The Debtor's Plan proposes to postpone payments on Kapitus's secured claim until the 61st month after the Effective Date of the Plan to allow Debtor to pay other secured creditor(s) and unsecured creditors from the proceeds of Kapitus's Collateral, this, by definition, is not in good faith. <u>See</u> <u>Plan</u>, p. 6 [Case No. 23-30246, ECF 108]; <u>see also</u> <u>Plan</u>, "Promissory Note," Exhibit C, p. 1 [Case No. 23-30246, ECF 108-3].

96.    Additionally, the interest rate proposed for Kapitus does not account for any risk, is affirmatively harmful, against Eight Circuit precedent, and not proposed in good faith. <u>Id</u>.

97.    Further, Section 1191(c)(3) requires a Subchapter V debtor to demonstrate that there is, at least, "a reasonable likelihood that the debtor will be able to make all payments under the plan." 11 U.S.C § 1191(c)(3).

98.    As mentioned, a related debtor, Bourbon Street LLC, moved to convert its companion case after filing a proposed Plan of Liquidation, via a *Notice of Cessation of Operations* filed on November 13, 2023. [Case 23-30246, ECFs 110, 115].  Specifically, Bourbon Street LLC noted it was "hopeful [the] matter may be converted to a proceeding under Chapter 7 of Title 11 of the United States Code, so that a trustee may oversee the windup of the Debtor's [Bourbon Street LLC] affairs." [Case 23-30246, ECF 115].

99.    With three months of negative cash flow from operations and only $1,634.84 remaining in the bank as of October 31, 2023 [nearly one month ago], one wonders why the Debtor has not moved to convert the above-captioned case to a proceeding under Chapter 7, and how the Plan is proposed in good faith.

100.    Setting aside Debtor's actual, reported financial circumstances via its MORs, Debtor's financial projections within the Plan alone fail to demonstrate a likelihood of full payment under the Plan.

101.    Kapitus believes the Debtor's Plan, viewed in light of the Debtor's reported financial condition, demonstrates, at the very least, an abuse of the purpose or spirit of the Bankruptcy Code, and, therefore, the Plan and its treatment of Kapitus lacks good faith pursuant to §§ 1129(a)(3) and 1191(a).

## V.  RESERVATION OF RIGHTS

102.    Kapitus expressly reserves the right to amend, modify, and/or supplement this Objection in all respects prior to or at the applicable hearing.

## VI. CONCLUSION

Based on the foregoing, Kapitus respectfully requests that the Court enter an Order denying confirmation of Debtor's Plan [Case No. 23-30246, ECF 108] and grant such other and further relief as the Court deems appropriate in law or equity.

Dated: November 27, 2023

Respectfully submitted,

*/s/ Elizabeth Lally*
Elizabeth Lally (admission to the United States
District Court for the District of North Dakota
granted 08/21/2023)

SPENCER FANE LLP
13815 FNB Parkway
Suite 200
Omaha, NE 68154
Telephone: 402.800.2299
Email: elally@spencerfane.com

**Attorney for Kapitus Servicing Inc., as Servicing Agent for Kapitus, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### (Fargo Division)

| | |
|---|---|
| In Re: | Bankruptcy No. 23-30246 |
| | Chapter 11- Subchapter V |
| Bourbon Street LLC, | Jointly Administered |
| dba La Cantina, | |

       Debtor.

_____/

| | |
|---|---|
| Petri Enterprises, LLC, | Bankruptcy No. 23-30247 |
| dba La Cantina, | Chapter 11 Subchapter V |
| dba Heros and Legends Sports Bar, | Jointly Administered |
| dba Heros and Legends, | |

       Debtor.

_____/

| | |
|---|---|
| Gannett Peak, LLC, | Bankruptcy No. 23-30248 |
| dba La Cantina, | Chapter 11 – Subchapter |
| | Jointly Administered |

       Debtor.

### CERTIFICATE OF SERVICE

   I, Elizabeth M. Lally, a Partner at the law firm of Spencer Fane LLP, and being of legal age, hereby certify that on November 27, 2023, a true and correct copy of the *Objection To Confirmation Of Petri Enterprises, LLC's Subchapter V Plan Of Reorganization By Kapitus Servicing Inc., As Servicing Agent For Kapitus, LLC* was electronically transmitted via CM/ECF. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing on counsel for the Debtor.

   Dated: November 27, 2023


           */s/ Elizabeth Lally*_____
           Elizabeth Lally